Morning. Good morning. Morning. This is a very sad case. No matter what the result, this is a 25-year employee who was terminated for an inadvertent mistake. You can call it a senior mistake, some things that we all do, but a mistake. Intent was not considered. Her medical emergency of her grandson was not considered, and she was tossed and branded a thief. And that's the color of her career now after 25 years. I'd like to start you out with a question about Mr. O'Keefe's affidavit. Good. That's where I was going to head. Really? Yes. This is a first. Mr. O'Keefe's affidavit suggests there may have been some concern about her credibility. In other words, she didn't leave the store immediately after the phone call. She didn't take her grandson immediately to the doctor. What do we make of those concerns? I have two. I'm glad you brought that up because, you know, I had a concern, and I raised it in my brief, and I was actually pretty upset about it because, first of all, I will address the second part first. Mr. O'Keefe didn't know those facts. Those were nowhere in the record until they took her deposition. And this was very big, heated in my brief, because those facts could not have been known to him at the time he made his decision regarding any of the grievance process, and I'll get to that second part. But the other thing is, this woman is a responsible woman, and as you know, when you have a medical emergency, you have to make an appointment. She couldn't get to the emergency room. She rushed. She was approximately 45 minutes to an hour away. She went to the doctor, and that was a medical emergency. She was flustered. She was flustered. I'm not saying that, you know, I can't tell you it wasn't life-threatening. We did have evidence that also was given to the board when she wanted to go to arbitration, but I had a problem with that affidavit. I have a problem with the second affidavit even more so. What was she doing with the card? Can you explain? That's easy. As long as you let me talk about Bennett when we're done, okay, because I don't want to get off that affidavit for a second. I want to go back to the Bennett case because I think the judge made a reversible error, a crucial error. But in answer to your question is, she was doing what she normally does in her job. The videotape showed that she was working with these two bags of birdseed, which she has no desire for. She was bringing it up front like she normally does to restock it. Nobody from Juul ever went in that store to even figure out what her duties were. That's a problem I had also with this. But she was bringing it up front in a cart. It's 25 pounds. She's not going to carry it. And then she puts it with the cashiers or the baggers and it's restocked. And that is her practice in the store. That's frequent. Also, other employees do that. Past the point of sale, no knowledge of it, irrelevant to me. Didn't leave the store. There's a document that said she left the store. She didn't leave the store. It's real clear she didn't leave the store. I don't know if that answers your question. Well, I mean, her purse and her coat are in the cart. Is that the way? Yeah. What was she doing? She's leaving. She's leaving. She's going to take her grandson. She puts her stuff in the top. It's in the top of the cart. And the bag of birdseed is heavy. It's in the bottom of the cart. It's open and obvious. She's not trying to steal it. I don't think anyone's ever said she's trying to steal it. Yeah, well, but that's the problem here. I have a greater problem, if I may address that. Sure. Okay. I think the Bennett case is directly on point. And I think Judge Lee, and I do like Judge Lee, I think he made a huge error. There is a collective bargaining agreement mandated grievance procedure. And it was not followed. It wasn't even close to being followed. Now, if you go to the second Keefe affidavit, and by the way, Judge, I have to complain a little bit about the procedure. I can't really address too much about Keefe because it was put in a reply. But I can do it now. And the point that I'm trying to make here is that he said in his affidavit that there's a longstanding understanding between Jewell and the union, that they don't, in termination cases, they don't follow the Step 1 grievance. They don't do the Step 1. And then Judge Lee said, and since associate relations, that's who does all the discipline anyways, is involved. Involved with what? Because they weren't involved with the union. Is involved. That it was okay. And that my argument is unavailing. I'm very confused by that, and I'll tell you why. Because there was no Step 2 conference. There was no Step 3 conference. I have a problem with there being no Step 1 conference. Well, there was no Step 2 conference and no Step 3 conference and no arbitration. So basically what this woman, even though there is a collective bargaining agreement Are you saying they didn't proceed to Step 2? No, ma'am, they did not. There's nothing in the record. And, in fact, if you look specifically where his opinion, he doesn't even mention a Step 2. He says it goes to Step 2 but doesn't mention there's a Step 2. But there is no Step 2. There was no Step 2. He said there was no meeting between the associate relations of Jewell and the union. None. And we've said that repeatedly. So that's the error. It's a big error. So you're saying that unless the terms of the CPA are filed exactly, there's automatically the process becomes arbitrary or in bad faith? No, sir. I'm not saying that. I'm saying like we're taught in law school and like a judge, when the words shall are used, that means mandatory. And the exact language of the grievance procedure for Step 1, Step 2, Step 3 says shall. Now, in arbitration, it's may. I have a problem with not being arbitrated. I can get into that later. But in terms of the grievance 1, 2, and 3, it says shall. And once the grievance is initiated, you cannot deprive her of her contractual rights. And they said, and it's even worse. It's so much like Bennett's. It's ridiculous. It's even worse. Well, we do it in some cases, in termination cases. That was the problem in Bennett's, too. Well, we do it in some cases. Well, we did it for her. Why? And as a matter of law, and that's what Bennett says, the Seventh Circuit case, Bennett says if you deprive an employee of the contractual rights of the Chicago Bargaining Agreement, it is per se a breach of the duty of fair representation. You know, your briefs seem to suggest at points that she was simply returning the bag of birdseed to the front of the store. That's what she does as part of her job. But I thought it was agreed that she was inadvertently walking out of the store with the car. I mean, could you please clarify that point? She never made it out of the store. See, now that's a really interesting point because, you see, and this is where I have a problem with the credibility of the union, of Mr. O'Keefe, because they say that intent isn't looked at. And then he says in his second affidavit, well, typically, Jewel doesn't look at intent. That's why I decided not to arbitrate. So that means that typically, sometimes they do. I'm not supposed to give it. There's another kind. But then I look at the point that she actually never made it out of the store, yet there's a corrective action review sheet they Meaning that they have to prove that she walked out of the store. They came up with this unwritten rule. Now, it says pass the point of sale, which is not reasonable given the fact that all employees at some point go past the point of sale with product. But out of the store versus past the point of sale is different. So to answer your question, I've got a roundabout way, is she never walked out of the store. Wasn't she heading out of the store with her purse and the birdseed in the cart? She was stopped by the security guard. I'm making a mistake. Did you ever walk out of a So if she had taken a few more steps, she would have been out of the store. Could have, would have. But she also may have said, oh, my God, there's a bag of birdseed. She might not have. Just the same way when you say, like, I almost forgot my keys before I left the house, but I didn't. That's my problem. All right. And she didn't notice this 25-pound bag of birdseed in the cart. She did. She rushed. The videotape, she rushed. She made it through that store very fast. She put it in the cart, and she was rushing. I mean, a couple apples I could see. It's a 25-pound bag of birdseed. Yeah, but the other side of the coin, it's really open and obvious. I mean, that's the point. It's not she's going to steal something. Why would she show it? Why would it be right there for a security guard? It's like, oh, my God, here's a security guard. It's right there. It's very, very open and obvious. Her coat was not covering it? No, sir. Absolutely not. In fact, if you look in the record, I let him say whatever he wanted to say, and then I showed him the videotape. And he argued with me, saying, no, there must be more videotape. Well, we got it from them. Nothing. All it means to me is that there was a concerted effort to try and show, even though they say there's no intent. I don't believe that. They're saying, oh, well, she really intended, because she concealed it. Well, if she had the concealment, she must have intended to steal it. Is there a – I mean, there may or may not have been a question to ask. Is there a practice among cashiers to check the lower rack of grocery carts? I don't know the answer to that question. I'd be quite blind. I mean, it didn't come up. It did not come up, sir, no. Sorry, I'm colorblind, but I realize that my time's up. Thank you. Okay. Good morning, Your Honors. Jonathan Carmel for the union, Local 881 United Food and Commercial Workers. I am going to reserve some of my time at the end for co-counsel, Mr. Warner from Juul, counsel for Juul. So was there a step two? There was not a step two, and I want to address that because counsel has made much to do about this. So there wasn't a step one? There wasn't a step two? No. And let me explain. Do I have to? I'm sorry? Do I have to? Do you have to what? Let you explain. No, you don't. Okay, go ahead. But I would like to. The parties, as Mr. Keefe's affidavit pointed out, have a practice, as many unions I represent do, that they advance cases to step two and out of step one. Step one is usually between the store manager who has no authority. He has no authority, but he knows the person best. Yeah, but they don't make the decisions. They're not the decision makers. So in this case, there was no step two meeting. There was a meeting between the union representative. She filed a grievance asking for the job back and all back pay. They met at a meeting with the store manager. It was not a step two meeting. And the grievance was denied by Jewell. Jewell wrote saying we're denying the grievance. At that point, the union has the discretion, and that's what this case is all about. What the union's discretion is in processing grievances in this case. What is the union's discretion? And as the courts have said, this Supreme Court and O'Neill, we have a wide range of reasonableness. So there was no step two. Instead, what occurred was it went to Mr. O'Keefe, who is the step two coordinator for the union. His job is to review grievances that have been processed and investigated by the representatives. And he'll review the file with the representative, which he did in this case. And he makes sure that they asked all the questions, did they obtain all the facts necessary for him to make a decision. And that's what he did. He reviewed all of the facts obtained in this case that were relevant. And he made a decision to not further process the grievance, to discontinue the grievance and not to arbitrate it. And Mr. Zasoff said, I think I heard him say, he doesn't really have a problem with that part of it. He has a problem with, I guess, this procedural issue of did we follow the contract to a T. You didn't follow it at all. Of course we did, Your Honor. We have the right under the law. There is nothing in, you have to measure our conduct, right? And let me give you an example. If we had an employee, a co-employee of Ms. Rupsich, who decided, I had a bad day at work. I'm done stocking groceries. I told my supervisor, I gave him the, I'm out of here. Doesn't clock out. And on the way out of the store, he goes to the meat department, picks up a sirloin steak, takes a cabernet off the shelf. Doesn't clock out and says, see you later. And doesn't pay for it. Jules terminates him. He calls the union. The union says, what happened? Well, I did all those things. I had a bad day. The union says, do you want me to file a grievance? Well, sure, file a grievance. And maybe the juul will grant the grievance miraculously. Well, they don't, just like in Ms. Rupsich's case. It is not required under the standard that the union then have some kind of perfunctory, useless meetings. There is nothing to be obtained at a step two or step three or step ten meeting at that point. The union has a right, under its discretion, afforded to it by, you know, the O'Neill case and all those cases. The union has a right to use its discretion to say, we've seen enough. We know enough. There is nothing to be gained by having a step two, three, four, or ten meeting. Tell me about this affidavit, please. Also, I learned that Rupsich did not immediately go to the doctor's office after work. Instead, she went home, changed her clothes, took her grandson to a doctor's appointment at least an hour and a half after the initial phone call from her husband. Sure. And that she didn't attempt to leave work early, but instead finished her scheduled shift. A couple of things, Your Honor, if you're done. Yeah. One thing is, Mr. O'Keefe was never deposed. I'm not sure why, but he wasn't, so that's why we used the affidavit. Mr. O'Keefe knew of this, these facts, from Ms. Robinson, the union representative, who had spoken to the member, Patricia Rupsich. These are all undisputed facts, and you raised the issue with Mr. Zaisoff about the credibility. And it was a concern. It wasn't a determining factor. I don't know. We can ask Mr. O'Keefe, he's here today. But there was no rush to get out of the store. She didn't call her store manager and say, my grandson has stopped breathing. I need to leave work immediately. She finished her shift. She scanned out her product, you know, put back stock back in the back room, or whatever she did. She clocked out, she took her handbag, put it in the cart, and pushed that cart along with a 25-pound bag of birdseed to the exit door. Who steals the 25? I don't know. I've been doing this for 30-plus years, Your Honor. I've seen weirder things than that, honestly. But that's not in the record.  Who does a lot of things? I'm troubled by your hypothetical you gave. Sure. So you're saying that the union enters into this CBA, but in their discretion they can basically, the union can basically abandon the process, even though the employee is coming to them and saying, look, I'm a union member, I want help. The union can just say, well, there's this process that we agreed to, but really, it's not worth it in this case. We're just going to abandon the whole thing. Isn't that by itself just arbitrary or bad faith? Well, it's not bad faith. Bad faith requires a subjective intent, which she has no evidence. Is it arbitrary? I don't think so at all. Okay? Again, I'll explain. I don't think the union is supposed to, in grievances, investigate grievances and make reasonable decisions, and they have a grievance procedure that they can use. Now, they can sit in grievance meetings and pound their head against the wall. If they come to you and say, if the member comes to you and say, look, I just stole a steak, what do you think about a union? That's not this case. I'm sorry? That's not this case. Well, it is. It is. It's a little more dramatic. The difference between birdseed and a steak. She's not going to go home and take the birdseed home and eat it. The union is afforded the discretion to say, we have made a decision. We don't need a grievance meeting with a company who has already denied our grievance. Is that within the union's wide range of reasonableness to make that decision to say, there's nothing to be gained at this grievance meeting. We know all the facts. That's where you learn a lot of the facts, by the way, is at grievance meetings. We know the facts. We know about her claim of inadvertence. We know that she nearly walked out of a stop by a security guard with a 25-pound bag of birdseed. We know about Juul's rules. So those are all the salient facts that Mr. O'Keefe had, and he made the decision, as is his job. There was nothing to be gained by going to this meeting, going to any grievance meeting, and have Juul tell you again, sorry, we're denying the grievance. I don't think this is a procedural due process case. I don't think that's what this is about. This is about examining the union's decision in not processing the grievance to arbitration, which I thought, again, Mr. Zaisoff said he doesn't really have a problem with that. The union is entitled to say, no, we're not processing the grievance. Would it have made a difference if we sat at a grievance meeting, and then under VOCA said, you can't compel us to arbitrate this grievance, and we're making a good faith decision not to arbitrate it based on these facts. What's the harm? Again, it might be what you would call harmless error, but I don't think it's even that. So why have a collective bargaining agreement if you don't have to live up to it? Well, but you have to. If the union wants, if there is a reason to go to a grievance meeting, we have that right. This union has 35,000 workers it represents. It files, I've been told, over 3,000 grievances a year. If we could be compelled to show up to a step one, step two, step three, because Mr. Zaisoff says it shall, we'll never get any work done. So why didn't you say in the collective bargaining agreement, if we feel like it, we'll do it? Because you and I didn't write the agreement with all due respect. These are collective bargaining agreements. They may not be perfectly formed documents, but there is a practice of how the parties apply the document, and that's what we've got here. Doesn't the union member have a right to rely on what the collective bargaining agreement says? And it says shall. If the agreement says you shall be paid $9 and you're paid $8, you've been harmed. The agreement says you shall go to a step one meeting and you don't. And be fired. And be fired. Isn't that worse than $1 an hour? And the union decides that they're not going to file, submit the grievance arbitration. And that decision was made in good faith based on the undisputed facts in this case. What's the harm that she didn't go to a step one meeting for Jewell to say, sorry, once again, we're not going to grant you grievance? Look, the harm is that it looks like here's a 25-year wonderful employee, allegedly, who has an emergency, walks out with 25 pounds of birdseed in plain view, and loses her job. And how could we have rectified that at the step one or step ten meeting? Who knows? Maybe the store manager would have said, I'm in love with Ms. Ruptich. I've been in love with Ms. Ruptich for 25 years because she is one of our really great employees. I implore you, do not fire her. Maybe that would have made a difference. How would I know? Maybe. I don't think so, Your Honor. My time's up. Is there any other questions of the court? Thank you. Thank you, Mr. Connolly. Thank you, counsel. Good morning. May it please the court, my name is Michael Warner, and I represent Defendant Jewell. For all the reasons stated by Mr. Carmel and by the union, the lower court's judgment should be affirmed. I just want to point out a couple other factors that support affirmance of Judge Lee's decision here. First of all, I want to point out the interpretation of the just cause standard as consistently applied by both the union and the company in this case. There's been a lot of discussion about, well, what did, was this an inadvertent mistake? What did Ms. Rupert intend in leaving the store? As indicated in Mr. O'Keefe's affidavit and Mr. Novosel's affidavit, under the consistent past practice of the parties, when it comes to an issue of misappropriation of employees walking out of the store or attempting to walk out of the store with merchandise, that doesn't matter. And the reason why both the union and the company have come to an agreement on that, and this is all about what is in the agreement between the union and the company, is very simple, and it's the sort of phenomenon that Mr. Zasoff himself mentions. It's all too easy for an employee who is intending to leave the store with a bag of birdseed at stake. As he or she gets stopped by security, what is that merchandise in your cart that you're attempting to leave the store with? Oh, silly me. I didn't realize I was attempting to leave the store with it. I'll just bring it right back. That's the excuse they give when security actually catches them, as it happened in this case. But in the vast majority of cases, Jewel does not have a security guard consistently at the front of the store. And if it were the case that all somebody would have to do to avoid detection for attempted theft or misappropriation and to say when they were caught is, oh, that was a mistake on my part, it would be impossible for Jewel and the union to enforce its misappropriation and theft standards. Well, there is. I think one of the things is that the birdseed makes a difference. Birdseed is not something like the steak that was mentioned. But that determination as to whether the birdseed makes a difference or not is ultimately an issue that was well within the union's discretion to decide based upon all the facts that were presented to the union by Ms. Rupcich herself, that as Your Honors pointed out, that number one, her story may not add up. She's not entirely credible. And number two, even if she is potentially credible, we don't think we can win this case in arbitration, given how the parties have consistently applied the collective bargaining agreement in the past. Thank you, Counselor. Thank you. I'll give you a minute. Yes. It won't be that long, anyway. I never said that I didn't question their decision not to arbitrate. I never said that. I think I've said in my briefs also I think you should look at a case called Mitchell, which says that it's an Illinois Supreme Court case. I know it's not binding, but it is certainly persuasive, and it's dual. And it applies to the just cause provision. And I think, again, I'm sorry to say Judge Lee made a mistake, but he didn't read the case. The case was about the just cause provision, not the policy. Misconduct was a term. Misappropriation implies some type of intent. And if you don't have some type of intent, throwing somebody out the door for an inadvertent employment mistake, this is exactly what happens. A long-term employee of 25 years gets shown the door for what would be a simple mistake, and then what employee is safe. And as to the collective bargaining agreement, you know what? He said it right here. They don't follow it. It's the only thing the employee gets in bargain for. That's what they've given away their rights for, a direct suit. That's exactly what they've given away. They've bargained their right to a direct suit, and that's what they get in exchange. Bennett said that. You can't deprive them of what they were entitled to. And in a termination case, exactly. You know, but one of the things, the Step 1 conference, I'm more upset by the Step 1 conference just as much, because the aggrieved employee has to be there. And was there an investigation? No. There was not a full investigation. Had there been more investigation, that's where she would have had a chance to say what she had to say. But what could she say? If they're saying, we don't care if she had intent, we don't care. Okay. I would have loved that to happen. Do you realize what the absurdity of that is? One of the union's job is to look at an unreasonable rule and say, we should challenge that. Maybe the union would have awakened. You would have hoped so. But if somebody, if an employee, she's saying, first of all, they keep changing on what the rule is. Pass the point of sale. Did you catch that in the briefs? Pass the point of sale. An unwritten rule. Not out the door. And that's what they said in her corrective action review. She said she's out the door because there is no rule about pass point of sale in writing for the employees. So they made up a rule. And they fire her for a rule. I'm not saying they made it up for her. I don't know when they made it up. She wasn't aware of it, and she didn't get the opportunity to talk about it or discuss it or even raise it in this grievance process. And it should have been raised. If it had gotten to arbitration, and I'm sorry, I've got my one last sentence. Had she gone to arbitration, I'm very confident she would have won it. Very confident. Because you can't get fired for an unwritten rule. Thank you. Thank you. Thanks to all counsel. Again, of course, the case will be taken under advisement.